**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL ACTION |
| v. | : | |
| | : | NO. 23-187 |
| THOMAS LAMBERT | : | |

## MEMORANDUM

**SURRICK, J.**                                                                                    **OCTOBER 18, 2024**

Defendant Thomas Lambert is charged with one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1).  (Indictment, ECF No. 1.)  Presently before the Court is Defendant's Motion to Suppress the firearm recovered by Philadelphia Police on March 9, 2023, as well as his on-scene statements ("Mot.," ECF No. 25), and the Government's Response in Opposition to the Motion.  ("Opp." ECF No. 35.)  On February 21, 2024, the Court held a hearing at which the Government presented the testimony and body camera recordings of two officers involved in the incident underlying Defendant's Indictment, and the parties made their respective arguments regarding Defendant's Motion to Suppress.  (1/21/24 Hr'g Tr. ("Tr."), ECF No. 38.)  Based on our factual findings and the authority set forth below, Defendant's Motion to Suppress will be denied.

## I.     FINDINGS OF FACT

Based on the Court's assessment of the record, including the testimony, demeanor, and credibility of the witnesses at the suppression hearing, the Court makes the following factual findings.[1]

---

[1] "It is well-settled that at a hearing on a motion to suppress, the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge." *United States v. Harris*, 884 F. Supp. 2d 383, 387 (W.D. Pa. 2012) (internal citations and quotations omitted).

On March 9, 2023, Philadelphia Police Officer Kevin Creely and his partner (identified in the transcript as "Officer McCurdy") were on patrol in an unmarked police vehicle, with Officer Creely driving, in the 24th Police District, which is in the Kensington section of Philadelphia.  (Tr. at 4:18-19, 6:18-7:7.)  At that time, Officer Creely had served as a Philadelphia police officer assigned to the 24th District for 20 years and had worked on "narcotics investigations, arrests, [and] VOFA violations"—the latter referring to violations of firearm regulations.  (*Id.* at 5:13-20.) He estimated that he had made around 100 arrests relating to firearms offenses during that time. (*Id.* at 5:18-25.)  Based on Officer Creely's experience, individuals carrying a firearm may show a weighted-down bulge in the area of the firearm, and they may blade their body away from an officer to avoid detection.  (*Id.* at 6:1-10.)  Officer Creely testified that he has worked on many narcotics investigations and that in his experience guns and narcotics tend to travel together.  (*Id.* at 8:15-17.)

At around 9:00 p.m. on March 9, 2023, Officers Creely and McCurdy were traveling in the unmarked patrol unit, with its windows down, near the 3100 block of G Street.[2]  (*Id.* at 7:8-11; 10:5-6.)  Officer Creely observed Defendant in the 3100 block of G Street.  (*Id.* at 8:18-22.) Defendant appeared to be speaking with another individual, and he was holding a Ziploc packet in his hand with a pinching motion.  (*Id.* at 9:1-22.)  As he was driving on G Street, Officer Creely heard someone yell to alert others on the block that the police were present.  (*Id.* at 9:25-10:11.) Officer Creely then saw Defendant make a stuffing motion into his pocket, jump up a set of steps to a house, and blade his body towards the door.  (*Id.* at 10:12-18.)  Defendant "then began to bang

---

[2] Officer Creely testified that this is an "[e]xtremely" high crime area.  (Tr. at 7:15-17.)  Regarding the kinds of crimes prevalent in that area, Officer Creely testified: "[T]here's been homicide incidents on that block.  There's been shootings.  It's a 24/7 open-air drug sales, all day/all night. . . . [O]ver the past year, we've had at least 50 arrests for drug violations on that block."  (*Id.* at 7:18-8:8.)  Officer Creely estimated that he was aware of five to ten arrests for firearms within a one-block radius of that area.  (*Id.* at 8:11-14.)

on the door . . . saying, "Let me in." (*Id.* at 11:11-18.)   Someone opened the door then "immediately shut the door in [Defendant's] face." (*Id.* at 11:19-23.)

Officer Creely, who was just exiting his vehicle, began approaching Defendant on foot and asked him what he was doing and whether he had a firearm. (*Id.* at 11:24-12:15, 31:15.) Officer Creely then reached out to pat down Defendant, at which point Defendant immediately jumped from the steps onto the sidewalk and fled on foot. (Tr. 12:16-13:1.) Officer Creely did not make physical contact with Defendant before Defendant fled from the stairs onto the sidewalk. (*Id.* at 13:2-7.) Defendant ran north on G Street, and, as he ran, discarded a blue satchel on the ground. (*Id.* at 12:22-13:1; *see also* Satchel Property Receipt, Hr'g Ex. 4.) Officer Creely recovered the satchel, while his partner pursued Defendant on foot. (*Id.* at 13:11-15; *see also* Creely Body Cam., Hr'g Ex. 1, 0:35-0:40.)

Officer Thomas Ditro[3] and his partner (identified in the hearing transcript as "Officer Mauro" (Tr. at 45:25-46:10)) were driving in the area when Officer Ditro observed the interaction between Officer Creely and Defendant, and the northbound foot pursuit on the sidewalk of G Street. (*Id.* at 46:19-47:8.) As Defendant fled, Officer Ditro drove his patrol vehicle to the corner of G and Allegheny to cut off the Defendant. (Tr. 46:20-47:8.) As Officer Ditro exited his vehicle, the Defendant was running directly at him without any signs of slowing. (*Id.*) Officer Ditro and his partner, Officer Mauro, engaged Defendant and brought him to the ground.[4] (Ditro Body Cam.,

---

[3] Officer Ditro testified that as of March 2023, he had been with the Philadelphia Police Department since 2016 and had worked in the "24th District for approximately three years." (Tr. 44:5-7, 44:13-16.) Officer Ditro testified that he has experience investigating crimes in the area "[w]hether it be narcotics, firearms, shootings, aggravated assault, violent crimes, in particular." (Tr. at 45:1-9.) Officer Ditro also testified that he is familiar with firearms and indicators that an individual might have a firearm. (Tr. 45:19-22.)

[4] Although Officer Ditro testified that he "pushed Mr. Lambert into [the] patrol vehicle," Officer Ditro's body camera footage indicates that his partner pushed Defendant and brought him to the ground. (*See* Ditro Body Cam. Footage, Gov. Hr'g Ex. 3 at 0:48.)

Gov. Hr'g Ex. 3 at 0:48; Tr. at 48:2-6).  The officers then handcuffed Defendant and stood him up in the street.  (Ditro Body Cam. at 1:02-1:30.)  The officers asked Defendant if he had a firearm. (*Id.* at 1:30-1:36.)  Defendant responded that he did, and that the firearm was in his left jacket pocket.  (*Id.*)  Approximately 20 seconds later, Officer Ditro asked Defendant if he had a permit to carry, and Defendant said he did not.  (*Id.* at 1:55-2:00.)  The officers recovered the firearm, a black Taurus PT Millenium semiautomatic pistol with a tan grip, from Defendant's left jacket pocket. (*Id. at* 2:52; Tr. at 48:2-14.).  The firearm was loaded with 11 total live rounds, including a round in the chamber.  (Gun Property Receipt, Gov. Hr'g Ex. 8.)

The satchel, which Officer Creely recovered, contained five 40-caliber spent shell casings, as well as a substance that Officer Creely believed to be marijuana.  (Tr. at 14:16-15:13; Shell Casings Receipt, Gov. Hr'g Ex. 5; Green Substance Receipt, Gov. Hr'g Ex. 6.)

## II.   <u>LEGAL STANDARD</u>

The Fourth Amendment protects against unreasonable searches and seizures.  U.S. Const. amend. IV; *see also United States v. Ubiles*, 224 F.3d 213, 216 (3d Cir. 2000).  "Generally, for a seizure to be reasonable under the Fourth Amendment, it must be effectuated with a warrant based on probable cause."  *Katz v. United States*, 389 U.S. 347, 356-57 (1967).  Additionally, an officer may "seize a person consistent with the Fourth Amendment if they have reasonable, articulable, and individualized suspicion that a suspect is engaged in criminal activity."  *United States v. Lowe*, 791 F.3d 424, 434 (3d Cir. 2015) (citing *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000); *Terry v. Ohio*, 392 U.S. 1 (1968)).

In general, "the burden of proof is on the defendant who seeks to suppress evidence."  *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995).  "However, once the defendant has established a basis for [their] motion, *i.e.*, the search or seizure was conducted without a warrant, the burden shifts to the government," *id.,* which must show "that each individual

act constituting a search or seizure under the Fourth Amendment was reasonable." *United States v. Ritter*, 416 F.3d 256, 261 (3d Cir. 2005).

III.   **CONCLUSIONS OF LAW**

Applying the foregoing legal standards to the factual findings detailed above, the Court reaches the following conclusions of law.

A.   **Defendant Was Not Seized during His Initial Encounter with Officer Creely.**

Defendant was not seized during his initial interaction with Officer Creely because he never submitted to a show of authority.

"A seizure occurs when there is either (a) 'a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful,' or (b) submission to 'a show of authority.'" *United States v. Brown*, 448 F.3d 239, 245 (3rd Cir. 2006) (citing *California v. Hodari D.*, 499 U.S. 621, 626 (1991)).  "Where a seizure falls in the latter category," the court must determine "if there has been a 'show of authority' using an objective test: 'whether the officer's words and actions would have conveyed . . . to a reasonable person' that he was not free to leave." *United States v. Lowe*, 791 F.3d 424, 430 (3d Cir. 2015) (quoting *Hodari D.*, 499 U.S. at 628).  "Whether an individual has 'submitted' to a show of authority depends on both the nature of the show of authority as well as the suspect's conduct at the moment the officer asserted his or her authority." *Id.* at 430-31.  "When a suspect flees after a show of authority, the moment of submission is often quite clear: It is when the fleeing suspect stops, whether voluntarily or as a result of the application of physical force." *Id.* at 431.

Here, the Parties dispute whether Defendant ever submitted to a show of authority by Officer Creely during their initial interaction.  Defendant contends that after Officer Creely exited his vehicle he "stayed put for approximately eight to ten seconds" and that "by remaining stationary as Officer Creely approached" Defendant "submitted to that show of authority" (Motion

to Suppress Memo. at 6.)  Defendant further argues that according to Third Circuit precedent "once a defendant has been stopped and seized for purposes of the Fourth Amendment, he does not somehow become unseized by subsequently attempting to flee."  (*Id.*)  To support his position, Defendant cites to *Lowe*, *Brown*, and *Sears*—cases in which the Third Circuit found that a defendant's submissions to a show of authority were not negated by subsequent acts.  (*Id.* (citing *United States v. Lowe*, 791 F.3d 424, 430 (3d Cir. 2015); *United States v. Brown*, 448 F.3d 239 (3d Cir. 2006); *United States v. Sears*, 835 F. App'x 671, 673 (3d Cir. 2020)).

In response, the Government argues that Defendant never submitted—even momentarily—to Officer Creely's show of authority.  (Opp. at 7; *see also* Tr. at 12:8-13:4; 31:15.)  The Government notes that Defendant "fled up the steps, attempted to enter a building to evade officers and then fled from the steps when he realized he had no escape."  (Opp. at 8.)  The Government further contends that Defendant's cited case law is distinguishable, and that the facts here are more akin to those in *United States v. Amos*, 88 F4th 466, 455 (3d Cir. 2023), in which the Third Circuit found that the defendant's "one-or two-second pause and halfway hand raise" did not constitute a submission to authority.  (Opp. at 7-8.)

Reviewing the evidence and case law, we find that the circumstances here most closely resemble those in *Amos* and that Defendant's referenced case law contains important distinguishing facts.  Critically, in *Lowe,* the defendant never fled but stayed put, and the Third Circuit distinguished this scenario from "[t]he most obvious example [of refusing to submit] when a suspect runs from the police."  791 F.3d at 433.  *Brown* and *Sears* likewise do not support Defendant's position.  In *Brown*, unlike here, the defendant initially submitted to authority when he "turned to face the police car and placed his hands on the vehicle in response to [an officer's] demand."  448 F.3d at 246.  In *Sears*, upon being instructed to stop, the defendant paused at the

6

door to his building, "elected not to enter," "turned around to face the approaching officers[]," and made a statement to them, which the Third Circuit explained constituted submission because it showed "more than 'momentary compliance.'"  *See* 835 F. App'x at 673.

The facts and circumstances here mostly closely align with *Amos*.  There, the Third Circuit found that the defendant never submitted to a show of authority after being confronted by the police officers, even though he "placed his hands at a 'halfway point' and stopped for '[m]aybe a second" before running away.  88 F.4th 446, 454-55 (3d Cir. 2023).  Here, Defendant paused at the top of a staircase to a house while he attempted to gain entry, but as soon as it was clear that he could not enter, he jumped from the stairs and immediately fled.  (Tr. 12:16-13:4;  Creely Body Cam. at 0:35.)  While Defendant may have momentarily hesitated at the top of the stairs while considering two potential avenues of escape, the record does not reflect that he submitted to Officer Creely's show of authority.  (*Id.*)

For these reasons, no seizure occurred during Defendant's initial interaction with Officer Creely.

**B.     The Officers Had Reasonable Suspicion to Perform An Investigative Stop of The Fleeing Defendant.**

When the officers stopped Defendant from fleeing, brought him to the ground, and restrained him, the Defendant had not yet been placed under a de facto arrest but was instead subjected to a *Terry* stop, which was adequately justified by reasonable suspicion.

To determine whether an investigatory stop was executed within the bounds of the Fourth Amendment, the Supreme Court prescribed a dual inquiry into "whether the officer's action was justified at its inception," in that it was supported by reasonable suspicion, and whether the manner in which the stop was conducted "was reasonably related in scope to the circumstances which justified the interference in the first place."  *Terry*, 392 U.S. at 20; *see United States v. Johnson*,

592 F.3d 442, 452 (3d Cir. 2010).  A lawful stop and frisk under *Terry* is a seizure that may elevate

into a de facto arrest, depending on "the reasonableness of the intrusion."  *United States v.*

*Edwards*, 53 F.3d 616, 619-20 (3d Cir. 1995).  Only if the *Terry* stop escalates into an arrest must

the seizure be justified under a higher probable cause standard.  *United States v. Sharpe*, 470 U.S.

675, 684 (1985).

Where they have a reasonable suspicion, officers may frisk, handcuff, and detain a suspect

while conducting their investigation.  *See United States v. Benitez*, 328 F. App'x 823, 824 (3d Cir.

2009) ("A police officer may also frisk a temporarily detained person if—in addition [to reasonable

suspicion of a crime]—they have a reasonable belief that the person is armed and dangerous."

(citing *Terry*)); *see also United States v. Goode*, 309 F. App'x 651, 654 (3d Cir. 2009) (finding

that officers' restraint of a defendant did not amount to an arrest where the defendant "was

suspected of dealing drugs, a crime with which 'weapons and violence are frequently associated'")

(internal citations omitted).

Here, the officers had reasonable suspicion to conduct a *Terry* stop of Defendant, who was

fleeing his encounter with Officer Creely.  Officer Ditro witnessed Officer Creely's initial

interaction with Defendant, and Defendant's immediate flight and, thus,  had reasonable suspicion

to stop the fleeing suspect.  *Compare* (Tr. at 46:19-47:8) *with Illinois v. Wardlow*, 528 U.S.

119, 125-26, (2000) (holding that headlong flight from the police in a high-crime area provides

reasonable suspicion, despite the fact that flight is not by itself illegal and could have completely

lawful and rational explanations).  In addition, the officers' actions—bringing Defendant to the

ground, handcuffing him, and asking him if he had any weapons—were reasonable given the

circumstances of Defendant's flight, and these actions did not transform the *Terry* stop into a de

facto arrest. *See United States v. Maxwell*, No. 23-cr-26-7, 2024 WL 200887, at *10 (E.D. Pa. Jan.

17, 2024) (finding that physical restraint of fleeing suspect was consistent with *Terry* stop, and that, once Defendant acknowledged he did not have a permit to carry the firearm on his person, reasonable suspicion for the temporary stop ripened into probable cause for arrest).

Here, after Defendant stated that he had a firearm but no permit to carry it, the officers' reasonable suspicion ripened into probable cause for arrest. *See Beck v. Ohio*, 379 U.S. 89, 96 (1964) (explaining that probable cause has been defined as facts which "would warrant [a] man of reasonable caution in the belief that an offense has been committed.") (internal citations omitted).

For these reasons, we find that the officers did not engage in an illegal seizure of Defendant.

**C.      *Miranda* Does Not Require The Suppression of Defendant's Statements.**

Defendant's statements that he had a firearm and did not have a permit to carry, as well as his comment that he had been framed, occurred in the context of a *Terry* stop, which does not constitute *Miranda* custody.  In addition, even if these statements did occur in the context of a custodial interrogation, the question regarding whether Defendant was carrying a firearm would still be permissible under the public safety exception.

> *1.      The Officers' Initial Detention of Defendant Was Not a Custodial Interrogation under Miranda.*

A defendant must be warned of his right against self-incrimination and his right to an attorney before he can be subjected to custodial interrogation by law enforcement. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).  Custodial interrogation occurs when law enforcement questions a defendant after he "has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Rhode Island v. Innis*, 446 U.S. 291, 298 (1980) (quoting *Miranda*, 384 U.S. at 444 (1966)).  "[T]he ultimate inquiry is: whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *United States v. Vidal*, 85 F. App'x 858, 861 (3d Cir. 2004) (internal citation omitted).  But "the temporary and

relatively nonthreatening detention involved in a traffic stop or *Terry* stop . . . does not constitute *Miranda* custody." *Maryland v. Shatzer*, 559 U.S. 98, 113 (2010).

Here, Officers Ditro and Mauro engaged with Defendant and pushed him to the ground after he fled from Officer Creely.  (Ditro Body Cam. at 0:48; Tr. at 48:2-6.)  The officers then raised Defendant to his feet, asked him whether he had a gun, and then whether he had a permit to carry a firearm.  (Ditro Body Cam. at 1:20-2:00.)  The questioning was brief and occurred at the resolution of a fast-paced foot chase, distinguishing this scenario from the inherently coercive questioning that might occur at the station.  *See United States v. Denson*, No. 06-cr-75, 2006 WL 3144857, at *3 (W.D. Pa. Oct. 31, 2006) ("Immediately after a pat down which this court found was part of a valid *Terry* stop, the officer asked defendant in a conversational tone whether he had a license to carry a firearm.  The questioning of defendant was extremely brief in that it involved merely the question regarding whether defendant had a license to carry a gun.  This question is benign and unintrusive.").  Finally, Defendant's comment regarding being framed was not made in response to any questioning or otherwise elicited by the officers, so we find no basis to suppress this voluntary statement.  (*See* Ditro Body Cam. at 1:45-2:00.)

> 2.  *Defendant's Statement That He Had a Firearm Is Also Admissible under The Public Safety Exception.*

In *New York v. Quarles*, the Supreme Court held that answers given to questions asked prior to reading a suspect his *Miranda* warnings will not be excluded from evidence if the purpose of the officers' question was "to secure their own safety or the safety of the public" and not "designed solely to elicit testimonial evidence from a suspect."  467 U.S. 649 (1984).  Applying this doctrine, the Third Circuit held in *U.S. v. Johnson* that the defendant's response to an officer's question "do you have a gun?" was admissible under the public safety exception.  95 F. App'x. 448, 452 (3rd Cir. 2004).

10

Here, upon stopping the Defendant and handcuffing him, Officer Ditro asked Defendant whether he had a gun, and Defendant responded that he did.  (Ditro Body Cam. at 1:30-1:36.)  As the Third Circuit held in *Johnson*, this question and Defendant's response fall within the bounds of the public safety exception and are therefore admissible.

IV.     **CONCLUSION**

For the foregoing reasons discussed herein, Defendant's Motion to Suppress is  denied.  An appropriate order follows.

BY THE COURT:


*/s/ R. Barclay Surrick*

R. BARCLAY SURRICK, J.